

# SUPREME COURT OF MISSOURI
## en banc

STATE OF MISSOURI,                  )

                           )

            Respondent,      )

                           )

v.                           )      No. SC100676

                           )

ANTHONY TATE,             )

                           )

            Appellant.       )

*Opinion issued April 1, 2025*

### APPEAL FROM THE CIRCUIT COURT OF ST. LOUIS COUNTY
### The Honorable Stanley J. Wallach, Judge

Anthony Tate appeals the circuit court's judgment convicting him of two counts of first-degree assault following a jury trial. Section 565.050.[1] He challenges the sufficiency of the evidence to support the first-degree assault convictions.[2] Tate further contends the circuit court plainly erred in failing to issue a corrective instruction to the jury regarding the State's closing argument and failing to strike portions of a witness's testimony as inadmissible hearsay.

---

[1] All statutory references are to RSMo 2016 unless otherwise indicated.

[2] The jury also found Tate guilty of first-degree murder, section 565.020, unlawful use of a weapon, section 571.030.1(9), unlawful possession of a weapon, section 571.070, and four counts of armed criminal action, section 571.015.

Because there was sufficient evidence to support Tate's first-degree assault convictions and the circuit court did not plainly err in failing to issue a corrective instruction *sua sponte* and strike the witness's testimony, this Court affirms the circuit court's judgment.

**Background**

On December 12, 2019, Tate, driving a Ford Edge, parked in a barbershop parking lot. He waited in the parking lot for 23 minutes until he pulled alongside another vehicle parked there. Tate then fired 15 shots into the vehicle, killing one passenger and injuring two others.[3]

After the shots were fired, the injured passengers ran to the barbershop. One injured passenger, A.H., was shot in the left leg. A.H. entered the barbershop and paced, hobbling and placing significantly more weight on his right leg when walking, and intermittently held onto the door frame.

When police arrived, an officer helped A.H. exit the barbershop and emergency personnel gave him medical care. After arriving at the emergency room, medical personnel treated the gunshot wound but left the bullet in his left leg. When A.H. left the hospital, he was supplied a brace and crutches.

M.E., the other injured passenger, was shot above his left knee and in his left hand. Medical personnel described the hand injury as "[f]layed flesh" in his left hand "with

---

[3] The passenger who was killed, T.S., died at the scene from his gunshot wounds.

2

exposed tendons" and a potential tendon injury. Medical personnel treated the hand injury by splinting his wrist and fingers.

M.E.'s knee gunshot wounds were approximately two centimeters wide and required sutures. After his hospital treatment, M.E. retained ballistic fragments in his knee and hand. Medical personnel placed M.E.'s hand and fingers in a splint with his fingers fully extended.

Immediately following the shooting, the Ford Edge was seen on video surveillance at a gas station approximately one mile from the shooting. The footage showed Tate exiting the driver's side of the vehicle, wearing distinctive clothing and with a tattoo or discoloration on the back side of his left hand.

Two weeks after the shooting, Tate, while driving the Ford Edge, fled police during a traffic stop. Police followed and arrested him. They recovered a backpack containing the gun used in the shooting, as later confirmed by bullet ballistics. Police further discovered Tate had made social media posts of himself with the gun. He also had posted photos of himself in the same distinctive pants seen on the gas station video surveillance.

The State charged Tate with first-degree murder, two counts of first-degree assault, unlawful use of a weapon, unlawful possession of a weapon, and four counts of armed criminal action.[4] At trial, the State showed the jury video surveillance of the

---

[4] The State also charged Tate with first-degree assault and armed criminal action against a fourth victim. The jury acquitted Tate of these charges, and they are not relevant to this appeal.

shooting and hospital photographs of both victims' injuries. A detective who had interacted with the victims while they were in the hospital testified their injuries were consistent with the doctor's diagnoses of gunshot wounds.

Based on this evidence, the State moved admit M.E.'s and A.H.'s hospital records into evidence. The records were 147 and 107 pages in length, respectively. Tate did not object to the admission of any part of the hospital records. The circuit court sustained the State's motion and admitted the records into evidence with no limitation placed on their use. The State published one page from each victim's hospital records to the jury. Each page stated the diagnosis of the gunshot wound(s), the arrival and discharge time for each victim, and that each victim was in stable medical condition upon discharge. During deliberations, the jury did not request to review the additional hospital records.

Prior to trial, the parties had agreed not to elicit information regarding whether the State had filed charges against Tate's cousin, whom the State also investigated. At trial, the lead detective testified his investigation of the cousin implicated Tate because the cousin was an associate of Tate's and both Tate's and the cousin's cellphone records placed them near the shooting. Tate admitted the cellphone was his, but said it was a shared phone used for selling marijuana illegally and he did not have it with him the day of the shooting.

Tate did not object to the lead detective's testimony. When cross-examining the detective, Tate's counsel elicited that the cousin had the same distinctive outfit Tate wore on the night of the shooting, implying the State may have misidentified Tate for his

4

cousin. Tate also testified he was near a family member's house at the time of the shooting.

During closing arguments, while explaining the lesser-included offenses, the State asserted:

> [Y]ou have for almost all of the counts what we refer to as lesser included instructions. Those are crimes that are – you've got your original charged crime, and then the lesser included. That's removing one element. So, for example, murder in the first degree is what he is charged with. ***You can consider murder in the second degree only if you find that he's not guilty of murder in the first degree.***

(Emphasis added). Continuing, the State explained other charged offenses, "I'll touch briefly on some of these what we call lesser included. And you'll see at the top, you don't get here unless you find him not guilty in the first degree. You review this, you find him guilty, you're done. You don't continue on." Tate did not object to these statements.

The jury found Tate guilty of first-degree murder, the first-degree assault of M.E., the first-degree assault of A.H., unlawful use of a weapon, unlawful possession of a weapon, and four counts of armed criminal action. The circuit court sentenced him to life in prison without the possibility of parole for first-degree murder, 15 years for each class A felony of first-degree assault, 15 years for unlawful use of a weapon, and seven years for unlawful possession of a weapon, with the sentences to run concurrently. The court also sentenced Tate to 15 years for each armed criminal action count, with those

5

sentences to run concurrently with one another but consecutively to the other sentences. Tate appeals.[5]

## Standard of Review

"When considering the sufficiency of the evidence on appeal, this Court must determine whether sufficient evidence permits a reasonable juror to find guilt beyond a reasonable doubt." *State v. Boyd*, 659 S.W.3d 914, 925 (Mo. banc 2023) (internal quotation omitted). "In making that determination, great deference is given to the trier of fact, and an appellate court will not weigh the evidence anew." *Id.* (internal quotations omitted). When determining whether the evidence presented was sufficient to support a conviction and withstand a motion for judgment of acquittal, the evidence and all reasonable inferences are viewed in the light most favorable to the verdict, and all contrary evidence and inferences are ignored. *State v. Minor*, 648 S.W.3d 721, 736 (Mo. banc 2022). This Court however, cannot "supply missing evidence or give the state the benefit of unreasonable, speculative, or forced inferences." *State v. Nowicki*, 682 S.W.3d 410, 418 (Mo. banc 2024) (internal quotations omitted).

## I.     *First-Degree Assault Convictions*

Tate argues the circuit court erred in overruling his motion for judgment of acquittal at the close of all evidence on his first-degree assault charges. He asserts the State produced insufficient evidence that he seriously injured M.E. and A.H. He further

---

[5] After opinion by the court of appeals, this Court granted transfer. Mo. Const. art. V, sec. 10.

argues that, in weighing the sufficiency of the evidence, this Court may not consider admitted evidence that was not published to the jury.

### A. Sufficiency of the Evidence

To be convicted of the felony of first-degree assault, the defendant must have attempted to kill or knowingly caused or attempted to cause serious physical injury to another person. Section 565.050.1. Further, to be a class A felony, the State must show that, in the course of the defendant's actions, he or she inflicted serious physical injury on the victim. Section 565.050.2.[6] Serious physical injury falls into three categories: (1) "physical injury that creates a substantial risk of death," (2) physical injury "that causes serious disfigurement," or (3) physical injury that causes "protracted loss or impairment of the function of any part of the body." Section 556.061(28). The issue presented here is whether the State produced sufficient evidence that Tate inflicted serious physical injury on M.E. and A.H. that caused protracted loss or impairment of the function of any body part.

Protracted loss or impairment is defined as "a decrease or diminishing or damaging of an action or ability of the body to do that for which it is intended that is something short of permanent but more than of short duration." *State v. Hall*, 561 S.W.3d 449, 454 (Mo. App. 2018) (internal quotations omitted). "Whether an injury constitutes protracted impairment depends on the circumstance of each case." *State v. Ross*, 939 S.W.2d 15, 18 (Mo. App. 1997). There is no minimum degree of trauma

---

[6] The class A felony of assault in the first-degree can also be met when the victim of the assault is a "special victim" as defined in section 565.002, RSMo Supp. 2017.

required, so long as the impairment is more than momentary. *Hall*, 561 S.W.3d at 454.

But pain resulting from an injury that does not affect the function of that body part is not

a "serious physical injury." *See State v. Baker*, 859 S.W.2d 805, 813 (Mo. App. 1993)

(holding stiffness in the victim's shoulder was enough to show protracted loss of the

shoulder's function because stiffness typically occurs during movement but an aching leg

when it is cold or rainy did not show the same loss of function).

In *Ross*, 939 S.W.2d at 18-19, the court of appeals held a defendant inflicted

serious physical injury on two victims due to the protracted loss of function of the

victims' legs. Defendant was charged with two counts of class A first-degree assault for

injuring two victims in a drive-by shooting and, on appeal, challenged the sufficiency of

the evidence for the two charges. *Id*. at 16-17. The court of appeals held each victim's

inability to walk without the aid of crutches for a week and several follow-up doctor's

appointments were sufficient to constitute protracted impairment. *Id*. at 19.

Similarly, the gunshot wound below A.H.'s left knee impaired the function of his

left leg. Video surveillance showed he was unable to walk normally in the immediate

aftermath of the shooting, putting more weight on his uninjured leg. Although hospital

personnel decided not to remove the bullet, they bandaged his wound and provided a

brace and crutches for his use after he left the hospital. Such evidence establishes

impairment in that A.H. lost full ambulatory function of his left leg. *See id.* at 18-19.

M.E. likewise suffered impairment as a result of the gunshot wounds to his left

hand and knee. The gunshot wounds to his knee were about two centimeters wide, and

range of motion testing on the leg was painful. M.E. suffered a tendon injury from the

8

five-centimeter gunshot wound in his hand. To treat the hand injury, medical personnel placed his hand and fingers in a splint with his fingers fully extended. This precluded his left hand from its regular function. *See State v. Bruce*, 53 S.W.3d 195, 200 (Mo. App. 2001) (finding the victim suffered serious physical injury when she had to have surgery to repair tendons and nerves in her hand from a knife wound and her hand was immobilized in a cast for two months).

Considering all the evidence and viewing it in the light most favorable to the verdict, the State presented sufficient evidence Tate caused M.E. and A.H. to suffer serious physical injury.

### B. The Medical Records

Although this Court concludes sufficient evidence supports Tate's first-degree assault convictions, Tate contends that, without consideration of the admitted, but unpublished, medical records, there was insufficient evidence that he caused M.E. and A.H. serious physical injury. The State published to the jury only one page of each victim's medical records, which detailed their diagnoses of gunshot wounds, the arrival and discharge times, and that each victim was in stable medical condition upon discharge. Tate argues the unpublished records may not be considered in the sufficiency analysis because only evidence "presented" to the jury at trial may be considered when reviewing the sufficiency of the evidence.

But the legal question in a sufficiency challenge is "whether the evidence was strong enough to reach the jury at all." *Musacchio v. United States*, 577 U.S. 237, 244 (2016). "[T]he relevant question is whether, after viewing the evidence in the light most

9

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The "critical inquiry" is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Id*. at 318. Once the State offered to the court, without objection from Tate, the medical records as evidence of the victim's injuries, and the circuit court admitted them as evidence without limitation,[7] those medical records, in their entirety, became part of the record evidence in the case. And, as explained above, that record evidence (i.e., the evidence admitted at trial) was sufficient to support a finding of Tate's guilt beyond a reasonable doubt.

In their briefs, the parties focus on the wording used in sufficiency of the evidence case law with respect to evidence "presented" or "adduced" at trial. *Compare State v. Jackson-Bey*, 690 S.W.3d 181, 186 (Mo. banc 2024) ("[T]his Court reviews whether there is sufficient evidence to support the charged crime[] based on the elements of the crime as set forth by statute and common law and the evidence *adduced* at trial." (emphasis added) (internal quotations omitted)), *with State v. Shaw*, 592 S.W.3d 354, 357 (Mo. banc 2019) ("To determine whether the evidence *presented* was sufficient to support a conviction …, this Court does not weigh the evidence but rather accept[s] as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict." (alterations in original) (emphasis added)). But whether it is said in the terms of evidence "presented" or "adduced," the real issue is whether the evidence

---

[7] "Evidence admitted for a limited purpose may only be considered for that purpose." *State v. Taylor*, 636 S.W.3d 630, 636 (Mo. App. 2021).

admitted at trial is sufficient such that any reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. To the extent the court of appeals has held that evidence admitted at trial, but not published to the jury, cannot be considered for purposes of a sufficiency of the evidence analysis, those cases should no longer be followed. *See State v. Hogan*, 297 S.W.3d 597, 601 (Mo. App. 2009); *State v. Castilleja*, 211 S.W.3d 165, 167 (Mo. App. 2007); *State v. Cryderman*, 230 S.W.3d 370, 374 (Mo. App. 2007).

Here, in reviewing all evidence admitted without limitation at trial in the light most favorable to the verdict, there was sufficient evidence Tate inflicted serious physical injury on M.E. and A.H. This Court finds no error in the circuit court's overruling of Tate's motion for judgment of acquittal.

## II.     *Unpreserved Claims*

Tate argues the circuit court plainly erred in failing to *sua sponte* intervene and issue a corrective instruction regarding the State's closing argument and in failing to strike the detective's hearsay statements. Because Tate did not object at trial regarding either issue, he requests plain error review of these unpreserved claims.

*Standard of Review*

Rule 30.20 governs review of any unpreserved claim of error. In relevant part, Rule 30.20 provides "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."

Review of these unpreserved errors is discretionary. *Id*. The defendant bears the

burden to show a manifest injustice has resulted from the error at issue. *State v. Baxter*,

204 S.W.3d 650, 652 (Mo. banc 2006). Even if the state's argument is improper,

"reversal is warranted only if the defendant shows the improper argument had a decisive

effect on the jury's determination." *State v. Wood*, 580 S.W.3d 566, 579 (Mo. banc

2019) (internal quotations omitted).

### A. Closing Argument

Tate argues the State's closing argument was improper and the circuit court's

failure to issue a corrective instruction was plain error from which manifest injustice

resulted. During its closing argument, the State told the jury, "You can consider murder

in the second degree only if you find that he's not guilty of murder in the first degree."

Although Tate did not object at trial, he contends this is a misstatement of law.

In *State v. Johnson*, the prosecution used language mirroring the State's language

here, and the court of appeals held it to be an impermissible acquittal-first argument. 599

S.W.3d 222, 226 (Mo. App 2020). In *Johnson*, during the State's closing argument, the

prosecutor said the jury could consider the lesser-included offense "only … if you find

[the defendant] is not guilty of murder first degree." *Id*. (first alteration in original). This

was a misstatement of Missouri law. *Id*. In a criminal case, a jury is instructed that each

juror must agree to any verdict. *Id*. Any "not guilty" verdict, therefore, must be reached

unanimously. *Id*. An acquittal first-argument is problematic because a unanimous

finding of not guilty is not the only way a jury could reach the lesser-included offenses.

The jury could also fail to agree unanimously the defendant was guilty of that degree of

12

the offense and turn to the lesser offense to which they all may unanimously agree he is guilty.

Regardless of whether the State used an impermissible acquittal-first argument, Tate cannot show the circuit court's failure to issue a corrective instruction resulted in a manifest injustice. Tate's defense at trial was that he was mistaken for the true perpetrator. This is similar to *Johnson*, in which the defendant claimed he was misidentified as the shooter. *Id*. at 227. The court of appeals held the risk of the improper instruction was limited by the defendant's trial strategy of claiming the State was prosecuting the wrong man. *Id*. Here, too, the risk of manifest injustice was significantly reduced by Tate's failure to focus on the degree of his criminal culpability.[8]

### B. Detective's Statement

Tate takes issue with the lead detective's statements on direct examination. The lead detective testified his investigation of Tate's cousin implicated Tate because the cousin was an associate of Tate's and both Tate's and the cousin's cellphone records placed them near the shooting. Tate did not object to the lead detective's testimony. When cross-examining the detective, Tate's counsel elicited testimony that the cousin had the same distinctive outfit Tate wore on the night of the shooting, implying the State may have misidentified Tate for his cousin. Tate also testified he was near the cousin's mother's house at the time of the shooting. Tate claims the detective's statement

---

[8] Additionally, there was no prejudice to Tate, as the circuit court properly instructed the jury regarding lesser-included offenses, and the jury is presumed to have followed these instructions. *Minor*, 648 S.W.3d at 731.

13

impermissibly relied on hearsay and went to the ultimate issue of whether Tate was involved in the shooting. Tate, however, Tate cannot show any manifest injustice or miscarriage of justice resulted from the circuit court's failure to strike this testimony.[9]

Tate acknowledged the cellphone he used was located in the area of the shooting. A man with a tattoo or discoloration on his left hand, the same hand on which Tate has a tattoo, was seen exiting a vehicle matching the description of the perpetrator's vehicle a few minutes after the shooting occurred. Two weeks after the shooting, Tate was arrested, and the gun used to fire at least 14 shots in the shooting was collected from the basement where he surrendered and was arrested. The circuit court's failure to strike the detective's statements, which were unrelated to these facts established at trial, was not a manifest injustice and did not have a decisive effect on the jury's determination. The circuit court did not plainly err in failing to strike this testimony.

### Conclusion

The circuit court's judgment is affirmed.

_____
Mary R. Russell, Chief Justice


All concur.

---

[9] *See State v. Perry*, 275 S.W.3d 237, 245 (Mo. banc 2009*)* ("[T]he failure of defense counsel to object to improper argument is often strategic in nature, and the taking of uninvited action by the court in such a case may simply emphasize the matter in a way defendant chose not to do."); *State v. Tisius*, 362 S.W.3d 398, 409 (Mo. banc 2012) ("[T]he failure to object during closing argument is more likely a function of trial strategy than of error.").